## NATIONAL ALUMINATE CORPORATION
### v. PERMUTIT CO.
#### No. 12827.

Circuit Court of Appeals, Eighth Circuit.
Oct. 18, 1944.

Rehearing Denied Nov. 13, 1944.

See, also, 144 F.2d 93.

John H. Bruninga, of St. Louis, Mo., for appellant.

Clarence D. Kerr, of New York City (Joseph J. Gravely, of St. Louis, Mo., and Furman Rinchart, of New York City, on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

It was alleged in the amended petition in the District Court in this case that plaintiff Aluminate company manufactured and sold ion exchanging products known as Nalcite A and Nalcite A X, for conditioning water, and that there was an actual controversy between itself and defendant Permutit company, in that Permutit asserted that Aluminate's manufacture and sale in-

fringed six patents owned or controlled by Permutit, namely:

| | | | |
|---|---|---|---|
| Smit | 2,191,063 | Granted Feb. | 20, 1940 |
| Smit | 2,205,635 | Granted June | 25, 1940 |
| Liebknecht | 2,191,060 | Granted Feb. | 20, 1940 |
| Liebknecht | 2,206,007 | Granted June | 25, 1940 |
| Vaughan | 2,190,853 | Granted Feb. | 20, 1940 |
| Riley | 2,127,310 | Granted Aug. | 16, 1938. |

Aluminate alleged that the patents were invalid and were not infringed by it, and it prayed a declaratory judgment against Permutit to that effect. The answer and counterclaim of Permutit contained the allegations necessary to present a suit for infringment by Aluminate of Permutit's six patents and prayed dismissal of Aluminate's petition, injunction, accounting of damages for infringement, and costs. Since the Smit patents issued to a Dutch corporation, the Alien Property Custodian was permitted to intervene specially, but did not take part in the trial. On the trial Permutit assumed the burden as a plaintiff in a patent infringement case, and the court found on the pleadings and evidence that Permutit's six patents were valid and that Aluminate infringed as to the claims identified, directly and by inducing others to infringe, and also that Aluminate threatened infringement by its recommendations to purchasers of its products. From the judgment accordingly entered against it, Aluminate has appealed.

Permutit's six patents relate to softening water and to conditioning it. As to softening, it appears that water is hard because it contains the salts of calcium and magnesium and the process of removing the hardness elements by filtering the water through a bed of granular inorganic material called "zeolite" has long been used commercially. Such zeolites are either found in nature and processed, or composed synthetically. The action that takes place when the hardness of the water is removed from it to the zeolite was described by the Supreme Court in 1931 in the words: "When hard water is passed through zeolites, they give up their sodium to the water, and take from it the calcium and magnesium as the new base. Zeolites have the peculiar quality that, after becoming exhausted in such use, they may be regenerated by passing a solution of common salt through them, whereupon they give up their new base of calcium and magnesium and take back their sodium base. They retain indefinitely these valuable properties." Permutit Co. v. Graver Corp., 284

U.S. 52, loc.cit. 54, 52 S.Ct. 53, 76 L.Ed. 163. But in the patents here involved and throughout this record the experts have preferred to describe the same phenomenon of base exchange between hard water and zeolites as "ion exchange." Base exchange is said to be an interchange of ions where positive ions exchange and combine the negative ions which were present beforehand. An ion is said to be an electrically charged particle, and matter is referred to as organic and inorganic. Inorganic matter is considered as comprised of salts, calcium, magnesium, sodium and potassium, which are usually electrolytes. Electrolyte, in turn, is a substance that in water solution undergoes dissociation, resulting in positive and negative ionic charges. Positively charged ions are called "cations", examples of which are calcium, magnesium, sodium and hydrogen ions. In the present terminology it is stated: "When hard water is passed through a bed of granular zeolite the calcium and magnesium ions of the dissolved calcium and magnesium salts in the water are substituted or exchanged for the sodium ions of the zeolite and such sodium ions pass off in the treated water." Water so treated is spoken of as passing through the sodium cycle and the zeolites adapted to the process are referred to as siliceous zeolites and as inorganic zeolites. The hard water treated in the sodium cycle contains sodium ions instead of calcium and magnesium ions but sodium ions do not constitute hardness. The water is soft and is satisfactory for household purposes and many industrial uses.

But this sodium zeolite water softening method had definite limitations. It did not remove the sodium; it did not reduce the dissolved solids and it did not remove the bicarbonate content (alkalinity) of the water. The calcium and magnesium bicarbonates were not reduced but merely changed into sodium bicarbonate. Where waters low in silica were treated, the amount of silica in the water was increased because the exchange material, whether natural or synthetic, being siliceous, gave up silica to the water which rendered it unsuitable for certain purposes.

Permutit and other workers in the art were long engaged in research in the attempt to discover an ion exchange zeolite material which would overcome these limitations of the sodium zeolite method and would further condition water for particular uses, but prior to the disclosures of

the patents in suit there was no zeolite ion exchange process effective to that end in commercial use.

Early in 1936, Permutit put on the market for the first time in this country a synthetic water filtering material which was nonsiliceous, described as a high capacity carbonaceous or organic cation exchange product. It was also referred to as a hydrogen-cycle zeolite and was designated by the trade mark "Zeo-Karb." It was made of granules of bituminous coal treated in a jacketed rotary drum with fuming sulfuric acid. It could be used as a zeolite to soften hard water in the old sodium ion exchange process (with some advantages over the old), and in that use it would be regenerated with sodium. But it could also be regenerated with acid and when so regenerated and water passed through it, it not only exchanges its hydrogen for the calcium and magnesium, but the sodium ions in the raw water are also similarly replaced by hydrogen ions. Those salts which were originally present in the form of bicarbonate, i.e., alkalinity, are transformed into the corresponding hydrogen compound, hydrogen bicarbonate (which is, chemically speaking, carbonic acid). This is the same as "charged water" made by injecting carbon dioxide ($CO_2$) into water ($H_2 O$) to produce carbonic acid ($H_2 CO_3$) and when the bicarbonate salts are so transformed the $CO_2$ gas is permitted to escape to the atmosphere by aeration. The other salts which if present usually occur as sulfates and chlorides, are transformed by this hydrogen zeolite process into the corresponding amounts of sulfuric acid and hydrochloric acid respectively. These in turn may be removed by processes not here involved to approximate distilled water.

This addition of a hydrogen ion-exchange cycle to the sodium ion-exchange cycle of the old siliceous zeolite as such addition is claimed to be disclosed in the patents and embodied in Permutit's Zeo-Karb, has been found to be very useful and Zeo-Karb has met with success. Although Aluminate has long made and sold zeolites, it never made a water conditioning zeolite which functioned in the hydrogen ion-exchange cycle until after the theories and practice of Permutit embodied in Zeo-Karb had been brought to its notice. It then began to manufacture and sell its Nalcite A and Nalcite A X, both of which are made by the application of sulfuric acid to coal and function as zeolites in both the sodium and the hydrogen cycles to accomplish results similar to those effected by Permutit's Zeo-Karb.

There has long been competition in the business of making zeolites for water treatment and wide research to find materials to make them better, and the claims to invention in respect to the mixture of such common and familiar substances as coal and sulfuric acid for that purpose were sharply questioned when they were so lately asserted. The thing appears too simple and obvious after the event. Indeed appellant is moved to state in its brief that the attribution of discoveries to the patentees is absurd. The file wrappers in evidence show strenuously contested proceedings in the Patent Office, and that the claims were subjected to long and searching investigations. The examiners in different divisions reached conflicting conclusions as to certain claims and the Board of Appeals was required to render its decisions in three several appeals. They sustained validity, and the six patents which were ultimately granted either belong to or are controlled by Permutit and it is entitled to sue for their infringement.

The trial court fairly epitomized the patents sued on by Permutit as follows:

"The Smit and Liebknecht patents disclose a water conditioning process consisting of the preparation of a hydrogen zeolite prepared by applying to lignite or coal concentrated sulfuric acid in quantities both less, equal to and exceeding an equivalent amount of the base material—lignite or coal, and the use of this zeolite as a filter bed through which water to be conditioned is passed with the result that upon contact with the zeolite the water gives up its magnesium and calcium and sodium ions and hydrogen ions are in turn released into the water and thereafter eliminated by aeration or other similar process. The process also includes the regeneration of the zeolites, used in the filter bed by the re-application of an acid, customarily sulfuric acid, to the zeolite. These zeolites may also be regenerated with a solution of common salt in which case they act as sodium zeolites and soften water by removing magnesium and calcium, giving up sodium to the water in exchange therefor.

"The distinctive features of the Smit and Liebknecht disclosures for the purpose of the present controversy are:

"(a) The use of a carbonaceous or organic base material such as lignite or coal for the manufacture of a hydrogen zeolite.

"(b) The increasing or creating of ion exchange properties of such base materials by the application of a concentrated sulfuric acid to the humic material in quantities up to approximately four to six parts of acid to one part of base material.

"(c) The durability of the resulting product.

"(d) The repeated regeneration of the resulting product by use of dilute acid for use as an hydrogen zeolite, or of common salt for use as a sodium zeolite.

"The distinctive disclosure, for present purposes, of the defendant's Vaughan patent is the use of a rugged organic material such as brown coal as a base and the revivifying or regeneration of the natural water softening propensities of this material by use of a very weak sulfuric or hydrochloric acid—of from one to five percent—instead of using a saline solution for the regeneration of the base as was done in processes following and carrying out the prior art.

"Although Vaughan characterizes his material as an hydrogen zeolite 'because it contains hydrogen as an exchangeable or replaceable ion', yet he does not do as Smit and Liebknecht have done in producing (what they call) hydrogen zeolites, to-wit—purposely enhancing or creating ion exchange capacity in the base material. It seems that the only claim Vaughan's material has to the designation 'hydrogen' zeolite results from the contact of the base material with a dilute form of acid by which the regeneration of the product to substantially its original potency is effected. Vaughan places a special emphasis upon the use of a natural humic substance as a base consisting of a durable, physically strong lignite.

"The defendant's Riley patent is distinctive, for present purposes, in that it discloses a use of a hydrogen zeolite and the regeneration of that zeolite by the use of only enough acid to regenerate only a portion of the zeolite used in the filter bed."

In its attacks upon the patents Aluminate cited and relied upon thirteen patents of the prior art[1], fully explained and compared with the patents in suit by qualified experts. It also introduced prior publications in this country and its experts gave their opinion that the prior patents and the publications disclosed to the skilled in the art all that was claimed in the patents. The voluminous proceedings in the Patent Office and in the Board of Appeals were also put in evidence and the record shows the keen interest of the trial court in the testimony as reflected in the questions to witnesses and colloquy with counsel. The court having found that the disclosures of each of the patents sued on constituted invention, our study of the record on this appeal has been to determine whether such finding was clearly erroneous. Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Gasifier Mfg. Co. v. General Motors Corp., 8 Cir., 138 F.2d 197.

It appears from the testimony of Aluminate's chemist Mr. Lindsay, that in the manufacture of its accused sodium or hydrogen-cycle zeolites, it "tried to follow Halse as closely as we can interpret his teachings", and throughout the trial and on this appeal Aluminate has insisted that the British patent to Halse of 1902 anticipates Permutit's patents and teaches those skilled in the art how to do what those patentees have claimed as inventions. And the question is not without difficulty. What Permutit does in the mixing of familiar coal and sulfuric acid to make its "high capacity organic cation exchange product" for zeolite treatment of water in either sodium or hydrogen exchange cycles is borne in mind, and we bear in mind also that it is not known just what happens when coal and acid are mixed[2] as Permutit relies entirely on the new and useful things its Zeo-Karb zeolite does to waters that are passed through it. We turn to Halse's specifications and claims to see what, if any, of the

---

| 1 Hepburn (British) | 173,255 | Dec. 28, 1921 |
|---|---|---|
| Hepburn | 1,426,633 | Aug. 22, 1922 |
| Borrowman | 1,793,670 | Feb. 24, 1931 |
| Petroff | 1,642,594 | Sept. 13, 1927 |
| Halse | 7,119 | A. D. 1902 |
| Cunningham | 1,711,449 | Apr. 30, 1929 |
| Cunningham | 1,711,448 | Apr. 30, 1929 |
| Ersbak (Danish) | 48,621 | Mar. 28, 1934 |
| Wunsch | 10,126 | A. D. 1914 |

| McElroy | 1,811,587 | June 23, 1931 |
|---|---|---|
| Liebknecht | 1,920,756 | Aug. 1, 1933 |
| United Water Softeners (British) | 389,076 | .............. |
| Hoodless | 1,589,532 | June 22, 1926 |

[2] The consulting chemist, Dr. Fuchs, says: "The chemical action consists mainly in the introduction of certain acid groupings into a complex compound that did not

teaching could have guided these patentees if they had known of them.

Halse says his invention relates to a process of carbonizing wood or matter of a similar nature, including lignite, for decolorizing and purifying sugar juices and all other liquids or for any other purpose to which animal charcoal had been applied. He made granular material from the lignite and mixed it with sulfuric acid in a mixer and then transferred the mixture to a kiln where it was carbonized by heating. He got the last traces of the acid out by washing in running water. The product was "a highly porous charcoal of very high decolorizing power." "Its porous character renders it a very powerful decolorant in addition to which it has the power of retaining a large proportion of the salts, many of which are known to be melassigenic, from syrups or saccharine juices which have been treated with it." After it was used it could be "freely washed with dilute hydrochloric acid to remove any calcium salts it may have absorbed" and used again.

Obviously Halse presents an instance thirty-five years earlier than the discoveries relied on by Permutit, where a member of the coal family was reduced to granules and mixed with sulfuric acid to produce a material through which liquids were to be filtered. It is argued for Aluminate, with support of their experts' opinion, that Halse made a hydrogen-cycle zeolite because that is what comes out when coal and acid are mixed as he mixed them (at least to some extent), and that Halse so taught, as indicated throughout his specifications, especially by his reference to removal by the dilute acid wash of "any calcium salts it [the charcoal] may have absorbed." But it is argued with equal earnestness for Permutit, supported by its experts, that Halse's specifications and patent demonstrate that he was working to effect color removal by the action known as adsorption or absorption (loosely used synonymously) by charcoal and that he indicated no knowledge of and taught nothing about the entirely remote problem of ion exchange where certain ions are exchanged from a treated liquid for other ions contained in the solid ion exchange material. If ion exchange material was produced by Halse (and Permutit contends there was not be-

cause the last traces of acid were washed out of his mixture in running water), Permutit contends it was accidentally and unwittingly done "whilst the operators were in pursuit of other and different results, without exciting attention and without its even being known what was done or how it had been done" and that "it would be absurd to say that this was an anticipation." Tilghman v. Proctor, 102 U.S. 707, loc.cit. 711, 712, 26 L.Ed. 279.

In the cited case the patentee claimed as his invention "the manufacturing of fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure" and the claim was sustained. Very likely fatty bodies were subjected to the action of hot water in a pot under some pressure long before and oftener than anybody knowingly mixed coal with sulfuric acid, but the problems as to whether or not there was invention solved in that case are not entirely without analogy here. Considering the extent of modern experimentation with coals and with acids, it is not possible that the two were never mixed for some purpose or other before Vaughan, Smit and Liebknecht, but if these inventors, in the mixing of the elements, discovered what others skilled in the art had not discerned, and produced what was new and useful, amounting to advances in the art, they could not be denied patents merely because their work was done with those old elements. We think the inferences to be drawn from Halse for which Permutit contends may be drawn fairly and reasonably. The Board of Appeals stated its conclusion: "There is no teaching in this patent [Halse] that decolorizing carbon has ion exchange capacity * * *", and the finding of the trial court that Halse did not anticipate was not without support in the evidence nor clearly erroneous.

Each of the other twelve prior patents has been studied in the light of the expert testimony, as well as the prior publications in evidence and the opinions of the experts, and our conclusion is that the trial court's finding that the patents in suit were valid was not clearly erroneous. The finding of the trial court that Aluminate's Nalcite A and Nalcite A X infringed the identified claims[3] of the patents sued on al-

have such groupings before the action." Dr. Riley says: "As a matter of fact, at the present time we don't know what takes place, it is all very mysterious as to what takes place."

3 Claim 3 in No. 2,127,310; claims 6, 11, 13 in No. 2,190,853; claims 3, 6, 9 in No. 2,191,060; claims 7, 13, 15 in No. 2,206,007; claims 2, 4, 10 of No. 2,191,-063; claims 7, 8, 12, 13 in No. 2,205,635.

so appears to us to be fully sustained by and in accord with the evidence.

■ It is contended for Aluminate that Vaughan abandoned the subject matter of his patent in that his claimed discovery and claimed reduction to practice occurred in March, 1931, and he did not apply for patent until May 13, 1935. The sufficient causes for his delay were fully explained. We think there was discovery and reduction to practice and that no circumstances were shown to justify an inference of abandonment. In Wietzel v. Lacy, 39 F.2d 672, 675, 17 C.C.P.A., Patents, 943, the court said: "After reduction to practice, abandonment will not be inferred merely from a failure to file an application for a patent to commercialize the product."

Appellant contends that the six patents include double patenting whereby certain of the most vital claims relied on and sustained were rendered void, and that certain claims invalidated others by anticipation. We think that the patents are unnecessarily prolix in verbiage and there should have been fewer claims more simply stated. They border on failure to comply with the statutory requirements concerning succinct description and particular pointing out and claiming. But consideration of the file wrappers and the trial court record has persuaded that those skilled in the art have understood them and the courts have had them explained. We have not found double patenting or invalidation of any one of the relied on claims of the six patents on account of the anticipation disclosed by any other.

Aluminate also pleaded as a defense to Permutit's counterclaim that Permutit misused its patents in attempting to obtain wrongful monopoly beyond the lawful scope of its patent monopoly. This defense was again urged upon a motion for new trial by Aluminate. The trial court made no specific findings on the issue in its decision at the trial, but by its ruling on the motion denying the same in general terms, it found the issue against Aluminate. The matter has again been extensively briefed and argued here, and we have examined the testimony relied on to show the alleged transgressions.

■ We recognize that the public has an interest in the restriction of patent monopoly within its lawful scope which the courts are alert to protect, and that

even an infringer may raise the question of misuse, Morton Salt v. G. S. Suppiger Co., 314 U.S. 488-493, 62 S.Ct. 402, 86 L.Ed. 363; that a patentee may not use his patents to fix resale prices of a patented product after he or his licensee has once sold it, Ethyl Gasoline Corp. et al. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; neither may the patentee impose as a condition of a license that the purchaser use unpatented supplies furnished by the patentee, Carbice Corp. v. American Patents Corp., 283 U.S. 27, 33, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; nor lease machines on condition that the lessee use only supplies furnished by the lessor, International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; nor may one company combine with its competitors in unlawful restraint of trade, Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; nor may the owner of patents under the guise of agency, fix the prices of patented articles at which the "agents" sell, after the patentee has parted with the articles when the arrangement is an agency in form only and not in fact, United States v. Masonite Corp. et al., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; nor may the patentee legally fix prices at which the licensee may sell "patented" articles where the patent is invalid, Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165.

■ But the testimony here was entirely insufficient to present any complete picture of just how Permutit carries on its business in Zeo-Karb under its patents. Its patents cover the process of manufacture, the product itself and the method of use, and we are not persuaded that its business practices have gone beyond its right to secure pecuniary reward for the several monopolies lawfully accruing to it from its patents. Although it has not offered unrestricted licenses to the public in general, neither its contracts shown to be in operation, nor its practices as testified to, substantiate Aluminate's charges. The new and useful product if offered by itself would mean nothing to the public. The method of use was ingeniously devised and duly patented, and so was the process of manu-

facture. The patent grants carry with them the right to exact compensation in respect to each. Applicant's contention that arguments and statements made on behalf of the patentees during the course of the proceedings in the Patent Office estop Permutit to sue for the infringements complained of appear to be without merit. The claims found to be infringed were each duly allowed in the Patent Office and sustained upon sufficient evidence by the trial court and they determine the scope of the patents. Neither do we find any failure to disclaim barring Permutit's right to maintain its action.

The judgment appealed from is affirmed.