**McCORD CORPORATION v. BEACON AUTO RADIATOR CO., Inc.**

Civil Action No. 50–176.

United States District Court
D. Massachusetts.

March 22, 1951.

E. J. Balluff, Detroit, Mich., Hector M. Holmes, Boston, Mass., for plaintiff.

Emery, Booth, Townsend, Miller & Weidner, I. U. Townsend, Jr., Harold L. Levin, all of Boston, Mass., for defendant.

FORD, District Judge.

This is an action for an alleged infringement of United States patents No. 2,252,210 and No. 2,252,211 issued on August 12, 1941 on applications filed October 18, 1939 to Paul R. Seemiller, and assigned by him to the plaintiff. Defendant denies infringement and alleges invalidity of the patents for anticipation and lack of invention. The claims involved in this suit are claims 2

and 6[1] of patent No. 2,252,210 and claims 1 and 4[2] of patent No. 2,252,211.

Seemiller patent No. 2,252,211 is a product patent for an improved tubular heat exchange core of the type used in the radiators of internal combustion engines, such as those of motor vehicles or airplanes, and patent No. 2,252,210 is for an improved method of manufacturing such a core. Plaintiff is a manufacturer of various types of radiator cores for use both as original equipment and for replacement purposes. In particular, it produces a core known as its CT core which it says is produced in accordance with the above patents. Defendant also makes cores of various types for replacement purposes, producing them both for use in its own service department and for sale to other users of replacement cores. In particular, it makes a TU core

1. No. 2,252,210.

"2. The method of making a heat exchange core of the tubular type which comprises assembling a plurality of pleated metal fin sections each having a multiplicity of folds that give the section rigidity in the direction of its thickness, in contact on the edges of their folds with a plurality of thin flat metal tubes having opposite convex fin engaging sides, the fin sections and sets of tubes alternating with the folds of the fin sections at right angles to the tubes, forcing said assembled fin sections and tubes together under sufficient pressure to compress the convex portions of said tubes until the opposite sides of the tubes are substantially parallel and insure contact between the tubes and the folds of the fin sections, and uniting said fin sections and tubes while they are held in said engagement.

"6. The method of making a heat-exchange core of the tubular type which comprises forming a thin, flat tube with a slight bulge along its longitudinal center line and with a stiffening means positioned to act as an accurate spacing means for the thickness of said tube; coating the outside of said tube with solder and a soldering flux, cutting said tube into predetermined lengths; forming pleated metal fin sections out of soft metal with the folds substantially parallel, with the edges of the folds rounded and of substantial width, and with said folds of sufficient frequency to give said fin sections rigidity in the direction of their thickness; assembling sets of said tubes in contact with the edges of the folds of said fin sections with the sets of tubes and fin sections alternating; forcing said assembled fin sections and tubes together under pressure to flatten said tubes until said stiffening means acts to space the fin sections and said fin sections acting to space said tubes, to thereby bring said fin sections and tubes into intimate engagement, with the sets of tubes accurately spaced from one another; applying heat to said fin sections and tubes while they are held in said engagement to melt the solder on the outside of said tubes; and cooling said fin sections and tubes while held in said engagement to thereby produce a core with the tubes and fin sections integrally bonded together."

2. No. 2,252,211.

"1. A heat-exchange core of the tubular type comprising a plurality of sets of substantially flat tubes with the tubes of each set arranged in line from front to rear of said core, and a single integral fin section between and united to each two adjacent sets of tubes, said tubes spacing said fin sections apart and each of said tubes being provided along one edge with a multi-layered portion forming a stiffening element extending transversely to the adjacent fin sections, said fin section being made of metal less than four thousandths of an inch (.004") thick and comprising a pleated metal strip having all of its folds substantially parallel with one another and of a frequency of at least nine per inch, the turned-over edges of said folds being rounded and of substantial width and each and every fold being integrally united over all its substantial width with the flat sides of the tubes on the respective sides of the fin section and for substantially the full width of the tubes.

"4. A heat-exchange core of the tubular type comprising a plurality of sets of substantially flat tubes, the tubes of each set being arranged in line from front to rear of said core, and a single integral fin section between and united to each two adjacent sets of tubes, said tubes having lock seams along their side edges dimensioned in the direction of the thickness of said tubes to act as spacers between the fin sections, each fin section comprising a pleated metal strip having all of its folds substantially parallel with one another, the turned-over edges of said folds being of substantial width and each and every fold being integrally united over its substantial width with the flat sides of the tubes on the respective sides of the fin section for substantially the full width of said tubes."

which is alleged to infringe plaintiff's patents.

The intense heat generated by the operation of an internal combustion engine must be dissipated by a cooling system. In the system ordinarily used with engines of motor vehicles water is circulated through chambers in the engine block where it becomes heated and is then pumped to the radiator and through passages in the core of the radiator to be cooled, and then recirculated. The water passages are separated from one another, and the intervening spaces partially occupied by thin strips of metal in contact with the walls of the watercourse and known as fins. As the water passes through the core, heat from the water passes to the metal walls of the water passages and thence also to the fins. A current of air set up by a fan passes through the core carrying off the heat from the walls of the water passages and from the fins.

At the time of the Seemiller patents there were two general types of core structure. The cellular type is made up of envelopes, i. e., strips of ribbons of corrugated brass folded in long narrow rectangles open along the sides. The fin is a strip of corrugated copper inserted into each envelope, having its folds so shaped and spaced as to make contact at regular intervals with the corrugated surface of the surrounding envelope. Along both sides of the envelope on its outer surface is a raised flange, so that when two envelopes are brought together side by side they touch only along these flanges, and there is an opening between the central portions of the bodies of the two envelopes which is designed to serve as the water passage in the completed radiator. The core is made by placing side by side a number of envelopes with their inserted fins sufficient to make a core of the desired size, clamping them in some manner to hold them together in the desired position, and dipping first one and then the other face of the assembled envelopes into hot solder. The solder by osmosis moves into the tiny spaces between the flanges of the envelopes, and between the inner surfaces of the envelopes and the fins. When it cools, the solder bonds the fins to the envelope and also bonds together the adjoining flanges so as to seal the water passages which have been formed between the envelopes.

The second type is the tubular core, in which the water passages consist of preformed metal tubes. The commonly used form was known as the continuous fin type. The fins in this type are thin sheets of copper in which have been punched a large number of slots, the metal being drawn out to form a short flange around each opening. A large number of these fins are lined up one behind the other in a frame which holds them so that the slots are in alignment and the fins are separated at brief intervals from one another. Each tube is then pushed individually through a set of corresponding openings in the assembled group of fins. These tubes have been precoated with solder, and when the assembly of the fins and tubes is complete, the whole is baked in an oven to melt the solder, which when cooled bonds the tubes to the flanges around each slot. Head plates are then fitted over the extremities of the tubes at both ends of the assembly to form the completed core unit.

Plaintiff's patents, being for a method of making a core and for the specific type of core resulting from the use of that method, may be discussed together. The patented structure is a core of the tubular type, i. e., it uses for the water courses preformed tubes of copper or brass, flat, but bulging slightly along the longitudinal center of the core. The tube is sealed with an accurately measured lock seam along one of its edges, and the outside of the tube is coated with solder. The fin portion of the core is made from thin strips of metal which have been accordion-pleated, so that there are between nine and twelve folds to the inch, each fold being about 7/16 of an inch high. The bend or edge of the curve is substantially rounded, and the sides of the folds are approximately parallel.

In constructing a core a fin section of the proper length and width for the core to be built is first laid down in a frame. On top of this are laid four tubes properly spaced by means of grooves along the side of the frame, so that the substantially flat

lower side of each tube rests on the folded edges of the pleated fin. Then the remainder of the core is built up to the desired height by alternately adding fin sections, and rows of tubes. The assembled elements of the core are then brought together with a clamp with sufficient pressure to produce intimate metal to metal contact between each tube and every one of the adjacent folds of the fin sections lying on either side of it. While still held in the clamp the assembly is heated in an oven and cooled, so that the tubes and fin sections are bonded by the solder with which the tubes had been coated. Then the head plates are placed in position at either end of the core, and soldered into place in a similar manner.

### Infringement

Defendant's TU core is in appearance very similar to plaintiff's CT core. Defendant uses tubes of the same type, the only difference being that they are coated with solder inside as well as outside. This, however, is to prevent corrosion, and has nothing to do with the construction or operation of the core. Its fins are also pleated strips of thin copper, with folded edges, approximately parallel sides, a height of about 7/16 of an inch and with the same number of folds to the inch. The only difference is that instead of projections or humps stamped in the individual folds, defendant's fins have small louvres or openings cut in the individual folds. This difference is not of great importance, since the projections are only an optional feature in plaintiff's patents, not included in the claims in suit and the use of openings in the fins to increase the dissipation of heat is an old device. Defendant contends, however, that at least its method of making the core is different. Defendant starts by putting the headplates in position on opposite ends of a frame. The tubes are put in place by inserting them into the proper holes in the headplates, and then the fins are inserted into the space between the tubes. Finally the assembly is clamped together, bringing it to its proper dimensions, and it is then ready to be placed in the oven. But this does not differ substantially from what the patent teaches. It amounts

only to a colorable rearrangement of the steps in the process which produces no difference in the result. It matters little in what order the tubes and fins are put in place since they assume the same ultimate relationship. The defendant's process of clamping the assembly together to bring it to proper size involves the application of the pressure which the patent calls for to bring the tubes and fins into contact. The construction of defendant's core was demonstrated at the trial. Before clamping, when the parts were in place with no pressure applied, the assembly of tubes and fins bulged. Measuring at the center of the assembly at right angles to lines of tubes and fins, the width of the assembly was almost an inch greater than its width after the clamps had pressed the parts together. Clearly, defendant in making its TU core infringes claims 1 and 4 of patent No. 2,252,211 and claim 2 of patent No. 2,252,-210. It is true claim 6 of patent No. 2,-252,210 includes the formation of the tube as part of the process described. Defendant does not make any tube, but purchases tubes which, while answering the description of the patent, are generally available on the market. I do not believe this circumstance affords an escape from infringing claim 6. Hence, I find that claim 6 is infringed.

### Validity of the Patents.

Plaintiff's contention that its structure embodies several distinct advantages over cores of the types previously manufactured may be summarized as follows. The continuous fin tubular core is much more difficult to construct. The holes in the fins have to be cut by dies which are expensive and wear out rapidly. The process of pushing the tubes through the slots by hand is slow and difficult, requires the use of more skilled labor, and involves considerable waste of material since tubes are often torn or twisted while they are being pushed into place. The flanges around the slots are generally somewhat irregular, and do not always make perfect contact with the tubes. Where the contact is imperfect the fin carries off less heat from the tubes and the heat-dissipating capacity of the core is

reduced. Plaintiff's core avoids these defects by providing a relatively easy operation for bringing the elements of the core together. The provision of a slight bulge in the tube, which comes into contact with the rounded edges of the folds in the fins, and is leveled off when pressure is applied, brings each folded edge of the fin into direct and intimate contact with the tube across its entire width. This improved contact insures greater utilization of the heat-dissipating capacity of the metal in the fins.

There is also a saving in the amount of metal used. Tubes can be made of thinner metal since they do not have to undergo the stresses involved in pushing them through the fins. The lock seam along the edge also adds strength to the tube, while accurate measurements of this seam, as well as of the height of the folds in the fins, means that these two elements serve to space one another accurately. Since the fins are made with a large number of folds to the inch with the sides approximately parallel, fins can also be made of thinner copper and still have sufficient rigidity. The difference in the thickness of the metal stock is slight (e. g. .003 inch copper instead of .004 inch copper in the fins) but since the metals used are costly the total saving in the manufacture of a large number of cores is substantial. There is also a reduction in the amount of metal used in comparison with cores of the cellular type. Large amounts of solder are used in making these cores. Only a part of the solder soaked up in the dipping process actually serves to bond parts of the core together. The rest merely adds unnecessary weight which is eliminated by the plaintiff's method.

In short, what plaintiff claims is that its patents show a simpler and easier way of constructing a core which is more efficient than cores of other types, in that, by the use of lighter metal stock and superior metal to metal contact, it has a greater heat dissipating capacity per pound of metal used.

It is admitted that the patents in suit are for combinations in which all of the elements are in themselves old. The elements are the same as those found in tubular cores of the continuous fin type-tubes, fins, and head plates. The head plates are the same in both, and nothing seems to turn on them. Tubes of the type described by the patent were well known to the art before 1939. Such tubes, of similar dimensions, solder-coated, and having a lock seam along the edge were shown, for instance, in the 1935 catalog of Revere Copper and Brass Inc., (Defendant's Exhibit D). The slight bulge called for by the patent is, as witness Askin explained, inherent in tubes of this type, since metal of this thinness, even when rolled flat, has a natural tendency to take on a slight curve. Pleated or corrugated fins were not new. The cellular type of core had long used such fins. Nor was it a new idea to make a core using alternate rows of tubes and fins. There were many patents which showed such a combination, using many different types of fins. Compare in particular, Miller's U. S. patent No. 937,380, issued in 1909, Spery's U. S. patent No. 1,401,565, issued in 1921, Cole's U. S. patent No. 1,407,929 issued in 1922, Curran's U. S. patent No. 1,454,107, issued in 1923. And it is admitted that so far as the operation of the core is concerned, the tubes and fins in this core function in the same way to dissipate heat, as fins and water courses in other types of radiator cores have always functioned.

Where, then, is there invention in Seemiller's patents? Plaintiff argues that although many others had secured patents on some embodiment of the idea of a core composed of alternate rows of tubes and fins, none of these had met with striking success until Seemiller produced a combination that did give superior results. His invention, it is contended, consists in the discovery that a successful core of this type could be made only by using a particular kind of tube and a particular kind of fin, put together in one particular way. Plaintiff relies on the fact that its claims call for a flat tube having a bulge along the side and fins with rounded folds, so that when these elements are brought together under pressure the bulge in the tube will flatten out so as to permit full contact of the tube with every one of the folded edges of the fins; and also on the provisions for the proper spacing of the tubes and fins

through having the elements accurately measured and through providing the requisite rigidity—in the tubes by the lock seam at the edge of the tube, and in the fins by providing a sufficient number of folds to the inch with the edges of the folds approximately parallel.

Patents such as those here in suit, involving only a combination of elements all well known and used in the art, put together in a manner which at least in its general outline was also well known and performing its operative functions in a familiar manner, must be carefully scrutinized, for generally speaking such a combination does not show invention. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151, 71 S. Ct. 127; Detrola Radio & Television Corp. v. Hazeltine Corp., 313 U.S. 259, 269, 61 S.Ct. 948, 85 L.Ed. 1319. The fact that there has been improvement, that the new device is more efficient than previous embodiments of the same general idea is not invention when the improvement is only such as could normally be worked out by one skilled in the art and acquainted with the developments which have already taken place. Atlantic Works v. Brady, 107 U.S. 192, 199, 2 S.Ct. 225, 27 L.Ed. 438. On the other hand, of course, the courts must avoid the danger of concluding that what seems simple and obvious once it has been pointed out shows no invention, since before the event the problem may have been one of real difficulty. Diamond Rubber Company v. Consolidated Rubber Tire Company, 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527. The question of whether what Seemiller has done constitutes invention must be weighed in the light of these principles.

The characteristics of the tube in Seemiller's patents on which reliance is placed are the bulge and the lock seam. As has been pointed out, the bulge was inherently present. The lock seam in itself was old and its utility as a means of adding strength to the tube had been pointed out before. Cf. Higgins' U. S. patent No. 1,937,343, issued in 1933. No invention is involved merely in having the tube made with a lock seam of accurate dimensions, so that this strengthening feature would also space the tubes accurately. The production of a tube of any desired dimensions was, as Seemiller pointed out in the specification of patent No. 2,252,210, only a matter of adjusting the tube mill of a well known type in which it was made.

Not only was the use of corrugated fins old, but fins closely approaching the distinctive requirements of the patent in suit were known. The drawings of U. S. patent No. 1,454,107 issued to Curran in 1923 show such fins with rounded edges and sides which are substantially parallel. Curran of course teaches nothing about the number of folds to the inch. But it was merely a matter of experimentation to discover how closely the folds of this accordion-pleated metal should be compressed to give sufficient rigidity. In fact the nine to twelve folds to the inch called for by the patent is approximately the same as the number of fins to the inch in the plaintiff's continuous fin type of tubular core. And not only in the number of folds to the inch but also in its general structure and dimensions the fin described in the patent is very much the same as the fin plaintiff uses in its single-spacer type of cellular core. In that core the fins were placed in brass envelopes which were then joined to form the water courses. If the preformed tubes long used in making cores of the tubular type are substituted as water courses in such a cellular core, then the envelopes are no longer necessary and the fins can simply be inserted between the tubes. The result is substantially what Seemiller has described as his invention. This seems to be such an expedient as would readily occur to anyone seeking what is claimed to be the achievement of the Seemiller patent—a core which combines the advantages of both the continuous fin core, and the cellular core, with the disadvantages of neither. Nothing in the combination described in these patents displays any advance over the previous art that would not be within the skill of the mechanic or engineer who was acquainted with that art.

Seemiller patent No. 2,252,210, the method patent, for the most part teaches only what is also disclosed in No. 2,252,211 as to the elements which make up the combina-

tion. What it teaches as to the process by which these elements are put together to form the core displays no invention. The mere lining up of the alternate rows of tubes and fins in proper order in some sort of frame, and the clamping together of the assembled parts is not new. That was the method already in use in building cellular cores. Neither is there any invention in the idea of applying pressure to bring the tubes and fins into full contact by levelling out any slight variations in the component parts which keeps them from touching at all points. It takes no more than the knowledge of the ordinary worker acquainted with the materials used here to realize that if two pieces of thin flexible metal are pressed together they will yield under pressure and conform one to the other so as to make a fully continuous area of contact. As defendant argues, all that involved is the familiar solution of getting a tight fit between two surfaces—having one slightly oversize yet such that it will yield somewhat when the two are pressed together. It is only the principle applied in fitting a cork tightly in a bottle. Moreover, the process used was already a familiar one in the radiator industry, since in the manufacture of cellular cores the envelopes containing the fins are placed loosely in position and then clamped together with sufficient pressure to bring the parts into the desired contact. The final step of soldering the parts by baking is of course only the method previously used in making tubular cores with the use of solder-coated tubes. Claim 6 includes the formation of the tubes and fins as part of the method, but the patent teaches nothing about how they are to be made, and points out that there is a well known type of tube mill to make the tubes and states that the method of making the fins is the subject of a separate patent application.

Plaintiff relies on the commercial success of its CT core, made under the patent, as indicating the presence of invention. This argument is available only as one evidential factor which may tip the balance in favor of invention, where the solution of that question is doubtful. Commercial success cannot make a patent valid where invention is lacking. Great Atlantic

& Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at page 153, 71 S.Ct. 127. Undoubtedly plaintiff's CT core has been successful. From the time of its first production in 1940, except for some decline during the war years, an increasingly large proportion of plaintiff's total sales have been cores of the CT type. In 1950 CT cores accounted for 74.32% of all McCord's shipments of radiator cores. But this new core is far from dominating the market. Great numbers of cores of the older types are still being made and sold. Plaintiff is one of seven or eight independent competitive manufacturers of cores, and there is no evidence that these competitors make cores of this type. Moreover, two of the largest automobile manufacturers, General Motors and Ford, still prefer to make their own cores, and use cores of a type different from that covered by plaintiff's patents. The sales record indicates that plaintiff's cores are of an improved type, having at least some advantage over the older types. But every improvement is not an invention. The commercial history of plaintiff's cores does not compel such a finding. It is equally consistent with a finding that there has been real improvement which falls short of invention.

To sum up, it is the opinion of this court that the product patent in suit (U. S. No. 2,252,211) runs head-on into the principles of the Great Atlantic & Pacific Tea Company case, supra, and Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008. As stated, the combination of elements disclosed in the product patent is old. They did not perform nor produce any new or different function or operation in the product than they did before. It may be true the combination produced results a little more striking perhaps than in any previous utilization, but they were, at best, differences in degree. The improved manufacture was substantially the same as of yore. I have followed the mandate of the Great Atlantic & Pacific Tea Company case and have scrutinized the patent claims in suit "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements" [340 U.S. 147, 71

S.Ct. 130] and find the product patent has subtracted from former resources freely available to skilled artisans. Whatever results the patentee produced over the prior art were differences in degree and were due solely to better mechanical construction within the competence of a skilled mechanic. Nothing additional is found, no new use could be made of it, and obviously differences in degrees of excellence are not patentable invention. Compare dissenting opinion of Judge Woodbury in Lincoln Stores, Inc. v. Nashua Mfg. Co., 1 Cir., 157 F.2d 154 at pages 164–165. The same reasoning is applicable to plaintiff's method patent, U. S. No. 2,252,210. The patent office was correct when it rejected the first application filed by the patentee and another on June 20, 1939. The applications for the patents in suit also should have been rejected.

The conclusion is that the plaintiff's U. S. patents No. 2,252,210 and No. 2,252,211 are invalid for lack of invention.

Judgment for defendant.