## ESSEX WIRE CORP. v. COLE-HERSEE CO.

### Civ. A. No. 51–222.

United States District Court
D. Massachusetts.

April 16, 1952.

Fish, Richardson, & Neave, Hector M. Holmes, Boston, Mass., J. A. Dienner, Chicago, Ill., of counsel, for plaintiff.

Thomson & Thomson, Arthur D. Thomson, Boston, Mass., for defendant.

FORD, District Judge.

Plaintiff brings this action for infringement of Clayton U. S. Patent No. 2,528,035 for a switch. The only question is as to the validity of the patent, since defendant concedes that the patent, if valid, is infringed by the accused switches which it manufactures.

The Clayton device is of a selective type designed to control the energization of one or more of a plurality of circuits. It is specifically intended for use in connection with directional signaling systems for automotive vehicles. The patent shows the switch in both rectilinear and rotary forms. The claims in suit are 1, 2, 3, and 4 which relate to the rectilinear form of the switch. Claims 1 and 2 [1] are typical of all of them. Defendant's devices are also of the rectilinear type.

1. "1. In a switch of the character described, a switch casing, a pair of contact carrying block members mounted for reciprocal sliding movement longitudinally of said casing, spring means between said block members for normally maintaining them in abutting engagement with the opposite ends of said casing, and a block carrier member bridging said block members and mounted for movement longi-

The switch in its rectilinear form is contained in a housing having in general the shape of a rectangular box. The bottom of this housing is a plate of an insulating material having seven stationary contacts set into it, flush with the inner surface of this bottom plate, and extending through it, so that wires leading to the battery of the car and the lights in the system can be attached thereto. Within the housing are two contact carrying blocks, one of which is normally at each end of the housing. A coiled spring extends longitudinally in the housing between the blocks, each block having a cylindrical recess in the end facing toward the center of the housing into which one end of the spring is received. The spring thus holds the blocks firmly in the normal position, pressed against the end walls of the housing, and leaving an open space in the center of the housing. Inside the housing at the top is a carrying member which is free to move in either direction longitudinally within the housing and has its ends provided with lugs extending downward adapted to engage shoulders extending upwardly from the upper part of the blocks, in such a manner that when the carrying member moves one of the blocks is carried with it into the center of the housing while the other block remains in position. Movement of this carrier is controlled by a knob which extends upward through a longitudinal slot in the upper surface of the housing. When this knob is moved along the slot to the left, the carrier moves with it, and carries the block at the right hand and of the housing to the

left so that it occupies the central space inside the housing. The block in the left hand portion of the housing is not moved by this operation, but is in fact held more firmly in place by the increased compression on the spring as the blocks are brought together. When pressure on the knob is released, the spring expands and forces the right hand block back to the end wall of the housing. A corresponding movement of the knob to the right will move the left hand block to the central position in the housing, while the right hand block remains in position against the right end wall of the housing. As the switch is actually installed a lever or handle may be provided to move the knob, a detent means may be included to hold the knob to the right or left even when the pressure applied to move it is released, and a further device may be included to release it at the end of a predetermined length of time, or when the vehicle has straightened out after completing the turn. These additional devices are not part of the switch and are not covered by the patent.

At the bottom of each of the two blocks in the housing is a contact plate of metal, triangular in shape, with the metal at each of the three corners of the plate depressed so as to form a contact. When these contacts are brought into engagement with contacts in the insulated plate which forms the bottom of the switch housing, the contact plate serves to bridge these contacts and thus form circuits between the battery and the signal lights on the car, and a change in the position of the

tudinally of said casing, said block carrier member having one way motion transmitting connection with each of said block members so that when said block carrier member is moved toward either one of said block members the block member toward which it moves remains in its normal position, and the block member away from which said carrier member moves is caused to be moved longitudinally inwardly of said casing against the force of said spring means.

"2. In a switch of the character described, a switch casing, a pair of contact carrying block members mounted for reciprocal sliding movement longitudinally of said casing, spring means between said block members for normally maintaining them in abutting engagement with the opposite ends of said casing, block carrier means bridging said block members and mounted for reciprocal movement longitudinally of said casing, and one way motion transmitting means between said block carrier means and each of said block members adapted when said block carrier means is moved toward either of said block members the block member toward which it is moved remains in its normal position, and the block member away from which said block carrier means is moved is caused to be moved longitudinally inwardly of said casing against the force of said spring means."

block, by changing the engagement between the contacts, can form different electrical circuits. Springs between the contact plates and the block serve to press these movable contacts into close engagement with the stationary contacts.

The signalling system controlled by the switch involves four lights, one at each side on the rear of the vehicle to serve both as stop lights and directional signal lights, and one on each side on the front solely for directional signalling. When the blocks are in their normal position, one at each end of the housing, each of the triangular contact plates has two of its contacts in engagement with two of the contacts in the insulated plate, viz., one connected to a rear light and one connected to the battery by a wire in which is interposed a conventional stop switch, actuated by depressing the brake pedal of the vehicle. When the circuits thus formed from the battery to the rear lights are closed by the closing of the stop switch a continuous current flows to the rear light on each side, causing a steady glow of these lights as a stop signal.

If the knob is moved to the right, carrying with it the left block, as described above, the contact plate on this block is moved so that its three contacts now engage three contacts in the insulated plate viz., those connected to the front and rear lights on the left side of the car, and that connected to the battery by a wire leading through a flasher mechanism. Circuits are thus formed through which an intermittent current flows to the signal lights which thereby give a flashing signal for a left hand turn. As previously pointed out, this operation leaves the right hand block in its normal position with the normal contacts undisturbed, so that if while the flashing signal for a left hand turn is being given the stop switch is also closed, a steady glow of the right rear stop light will result. For a right hand turn, the control knob is moved to the left and a corresponding circuit formed to cause the front and rear lights on the right side to flash, while the left rear light can be energized to a steady glow by closing the stop switch.

The rotary type of switch shown in the patent operates on the same principle, and differs only in such details of construction as are made necessary by the fact that a circular housing is involved, and movement of the parts is in a circular rather than in a straight line direction. It has the same arrangement of separate blocks held in normal position by the force of a spring, with contact carrying plates whose contacts in that position engage stationary contacts to form circuits to the rear lights for stop signalling, and a plate which can be rotated to the right or left by means of an attached handle, so as to carry one block to a new position where the contacts form circuits for the energization of flashing signals in the lights on one side of the car while the other block remains in its normal position.

The development of directional signalling systems for motor vehicles using lights to replace hand signals, has taken place chiefly within the last twenty years. Numerous types of switches have been developed to control such systems. A survey of the prior art shows that the Clayton switch is a combination of elements all of which were known to the art and had been used in switches to perform the same functions they perform in Clayton's device.

The Nesson patent No. 2,194,210 issued March 19, 1940 disclosed a switch designed to produce exactly the same result from the electrical standpoint which Clayton produces. The Nesson switch in normal position provides circuits to the rear stop lights on both sides of the car which can be closed by a stop switch to cause a continuous glow of those lights. The switch can be operated to two other positions, in each of which a circuit is created to provide a flashing signal in the front and rear lights on one side of the car, while at the same time the rear stop light on the other side of the car can be energized to a steady glow by closing the stop switch. Nesson has an arrangement of fixed contacts from which wires lead to the lights and the battery, and also two contact carrying members, which he calls the spider conductor and the segment conductor, slidable to different positions with respect to the

stationary contacts so as to form the different circuits. Nesson shows only a rotary form for his switch and this action is concerned primarily with the rectilinear form of the Clayton switch, but, as Clayton himself testified at the trial, the essential principle of the Clayton switch is the same in both forms. The Clayton and Nesson switches differ in that Clayton has provided two separate blocks to carry the movable contacts with a carrying member which can move one of these independently of the other, while Nesson's shows his spider and segment conductors joined to his operating handle in such a way that both must be moved together. Thus Nesson had succeeded in producing exactly the same end result which Clayton achieves. Clayton only did the same thing as Nesson, but by a somewhat different mechanical operation.

The arrangement of movable contacts which can slide to different positions with respect to a set of fixed contacts was not only found in Nesson, but other prior patents show such movable contacts in form substantially the same as Clayton has them, i. e., triangular pieces of metal, having a contact formed in each of the three corners, carried on the bottom of contact carrying members with springs arranged so as to press them into firm engagement with the stationary contacts. Both the Lawson patent No. 2,385,629 and the Rom patent No. 2,086,959 show such triangular contact plates, and Rom also shows the same arrangement of springs to keep the contacts in close engagement.

Independently movable contact members are shown in Reamer's switch patent No. 1,751,398. Here two independent switch arms are held in a normal or neutral position by means of a connecting spring. There is a lever adapted to engage in notches which are provided in each of these switch arms, so that when the lever is thrown to the right or to the left it engages one of these arms and carries it to a new position while the other arm remains stationary. When the lever is thrown all the way it locks in position, but when it is released by a slight movement the force of the spring joining the two arms will cause the arm which has been moved to return to its normal position. Thus it performs substantially the same function as Clayton's spring in holding both contacts in normal position when no force is applied to move them or hold them in another position. The Smellie switch patent No. 2,056,743 shows an arrangement whereby a slide, movable longitudinally by means of a lever, is provided with fingers or lugs which engage contact carrying members, so that a movement of the slide in either direction will move one of the contact carrying members but not the other.

Parsons' patent No. 2,049,747 for a circuit controller shows a switch for controlling a plurality of circuits which displays some of the essential mechanical elements of the Clayton switch. Parsons shows his three contact carrying members in the form of rings mounted on a shaft along which they can slide longitudinally within the housing. There is a slidable rod with collars attached thereto to engage the contact members and carry them along with the rod when it is moved longitudinally. In particular two of the contact carrying members are shown with a coiled spring between them which tends to push them apart and press them against stops on the shaft. The arrangement is such that when the rod is moved a collar can carry one of this pair of contact carrying members to a new position while the pressure of the spring holds the other one stationary.

The various elements which make up the Clayton switch are all to be found in the prior art patents. In the Clayton switch they all perform a previously known mechanical or electrical function. Clayton's switch is new or unique only in that no one before Clayton had joined these old elements in the specific combination shown by Clayton. The question of whether such a combination shows such invention as to make the patent valid must be decided in accordance with the strict tests made applicable by recent decisions. Such a unification of old elements does not amount to invention unless it produces "unusual or surprising consequences" and the claims must be severely scrutinized "with

a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162.

Plaintiff's contention that the Clayton patent meets this test of invention is summarized in its brief as follows:

"The consequences of the unification of elements in the Clayton switch are unusual and surprising in the following respects: to wit, a definite saving in space over any switch which will perform the same service; a surprising economy of material, with consequent reduction in cost; remarkable simplicity; reduction of motion and wear on each movable contact to just one-half of what is required in a conventional switch. The switch has greater life because of reduced wear and the small degree of motion required to give a signal.

"Finally, the switch maintains a lower resistance throughout its life, so that lamps will be illuminated more brilliantly."

Clayton himself, who was the principal witness for plaintiff, after first stating that "Our switch does not provide any different function or any different result but it accomplishes that in a little different manner", later testified that the one important factor in his switch, the only unusual or surprising consequence of its construction was the longer life expectancy of the switch. This was explained as being due to the fact that whenever a turn signal is given only one of the blocks with its movable contacts changes position, and thus these movable contacts are subjected to only half the wear that would take place in a switch where every movable contact moved each time a turn signal was given. Clayton also testified that it was well known in the art that reduction in the amount of motion between sliding contacts reduces the amount of wear between them. The idea of having only one element of a switch move while another remained stationary was not new. Reamer and Parsons had already done that.

The application of that idea to a sliding switch is no more than an exercise of mechanical ingenuity. That the result should be a reduction in wear on the parts can hardly be called an unusual and surprising consequence. Further, it is not clear that Clayton's claim to have doubled the life of the switch is wholly justified. The wire from the battery through the flasher leads to a single stationary contact in the switch. Every signal for a turn in either direction causes wear on this contact, since a movable contact from one or the other of the two blocks must engage this stationary contact to produce the signal. Although wear on the movable contacts may be reduced, one link common to both the right and left signalling circuits is still subject to the same amount of wear.

The maintenance of a lower resistance and consequently of a lower voltage drop in the switch is claimed as another result of the fact that one block with its contacts remains stationary when the other moves. Here again it was known that the elimination of movement would help maintain lower resistance and this result was achieved by the use of known elements, working in their usual way. Furthermore, there was no evidence of the actual amount by which the resistance was lower in comparison with switches where all the contacts move in each operation, and hence no basis for any finding that this lowering of resistance was such as to constitute any substantial advantage in the Clayton switch.

It is significant, moreover, that the increased longevity and the lowering of resistance were not pointed out anywhere in Clayton's application as advantageous results of his construction, nor is there any indication in the application that the wearing out of contacts or the increased voltage drop due to movement of the contacts were regarded as significant elements in the problems which his construction attempted to solve.

 The end result which Clayton sought to accomplish, the control of the circuits of the directional signalling system, was already being accomplished by existing switches, and what Clayton endeavored

to do was to make a switch which would do the same job and yet be simpler, more compact, and hence less costly. No doubt what he produced required the ingenuity of a mechanic skilled in the art. The evidence indicates that the Clayton switch is an efficient one. Its construction was a forward step in the making of switches, but it does not appear to have been a startling or revolutionary development. Associated Folding Box Co., Inc., v. Levkoff, 1 Cir., 194 F.2d 252, 257; McCord Corp. v. Beacon Auto Radiator Co., Inc., 1 Cir., 193 F.2d 985, 989. The results produced by Clayton are good but they are clearly not the " 'unusual or surprising' consequences" which are required to establish invention. Great Atlantic & Pacific Tea Co., case, supra. And where invention is thus lacking neither the commercial success of Clayton's device (insofar as its sales can be attributed to its superiority over other switches and not merely to a generally increased demand for such switches as a result of recent state laws requiring use of directional signals) nor the "tribute of defendant's imitation", can create invention where it does not exist. McCord case, supra. The conclusion can only be that the Clayton switch patent No. 2,528,035 is invalid for lack of invention.

The complaint is dismissed and judgment entered for defendant.