Giuseppe **BRANDANO** and G. Brandano & Sons Co., Inc., Plaintiffs,

v.

Stanley **L. HANDMAN** and Arthur Rosenberg as individuals and partners doing business under the firm name and style of Dayno Sales Co., Defendants.

Civ. A. No. 61–468.

United States District Court
D. Massachusetts.

July 31, 1964.

Joseph Zallen, Boston, Mass., for plaintiffs.

Robert G. Kline, Arthur D. Thomson, Boston, Mass., for defendants.

JULIAN, District Judge.

This is an action brought by Giuseppe Brandano, patentee, and G. Brandano & Sons Co., Inc., alleged exclusive licensee, against the defendants Handman and Rosenberg, doing business as Dayno Sales Co., for alleged infringement of a patent.

The issues of validity and infringement of the patent were severed from the question of damages and were tried to the Court.

The defendants contend that the claims in the patent are invalid for lack of invention over the prior art, and that the article made and sold by them does not infringe any of the claims.

## FINDINGS OF FACT

1. On April 25, 1961, the United States Patent Office issued patent No. 2,-981,228 to the plaintiff Giuseppe Brandano for a tank "for displaying and maintaining shellfish, such as lobsters, in a healthy condition," commonly referred to as a lobster pool. The application for the patent was filed on April 13, 1959.

2. The patent contains six claims. The plaintiffs have abandoned claim 6 and rely on the first five. These are set out in the margin.[1]

3. The tank is a box-type structure, taller than it is wide, with an open top. The tank consists of three compartments: 1) an upper compartment for storing and displaying live lobsters; this compartment is coextensive with the length and breadth of the tank; 2) two lower compartments separated from each other by a vertical wall; one is used as a reservoir for brine water, and the other contains conventional refrigerating equipment and a pump for pumping the water from the reservoir compartment to the upper compartment. The upper compartment is separated from the two lower compartments by a horizontal wall which constitutes the bottom, or the floor, of the upper compartment and the ceiling of the two lower compartments. A fil-

1. The first five claims read as follows:

"1. In a tank for displaying and maintaining shellfish, such as lobsters, in healthy condition, the combination of an upper compartment for containing water and displaying the shellfish, a lower compartment for containing water, a wall having an opening therein and separating said upper and lower compartments, gravitational fluid flow means in said opening for communicating between said upper and lower compartments, said lower compartment having sufficient volumetric capacity to hold the normal supply of water for both upper and lower compartments, whereby the upper compartment water may be readily emptied into the lower compartment to provide access to said fluid flow means for replacement thereof, a standpipe extending above the normal water level of said upper compartment and through said wall for supplying air to said lower compartment, and a water circulating system including a pump, a water intake for said pump in said lower compartment and a water output for said pump above the water level of said upper compartment, the volumetric capacity of said upper and lower compartments and the rate of said pump being so related to maintain an air space in said lower compartment, whereby the water in said lower compartment is at a level below said means and is therefore capable of absorbing air as the water gravitationally flows from said means to said lower compartment, which air absorbed in the water is adapted to be introduced with the water into the upper compart-

ment to maintain the oxygen content therein at a value to enable the shellfish to be maintained in a healthy condition.

"2. A tank according to claim 1, wherein said means is a removable filter disposed in said opening of said wall separating the lower and upper compartments for straining the water in said upper compartment as it drains gravitationally into said lower compartment.

"3. A tank according to claim 2, wherein said filter means is constituted by a hollow receptacle disposed in said opening in said wall, an external flange on said receptacle resting on a shoulder of a recess provided adjacent said opening in said wall, said receptacle having apertures disposed around its periphery above said flange for passage of water therethrough from said upper compartment, and filtering material within said receptacle below said apertures for straining solid particles from said water.

"4. A tank according to claim 1, wherein said lower compartment has a sump, said pump has a second input in said sump and a second output exteriorly of said tank, and valving for selectively opening said first mentioned input and output of said pump and closing said second input and output of said pump vice versa to respectively circulate water or empty said sump.

"5. A tank according to claim 1, wherein said standpipe is adjustable to predetermine the maximum water level in said upper compartment."

ter box having a perforated removable cover and containing a replaceable filtering element is located in the bottom of the upper compartment. Water from the upper compartment flows through the filter box into the reservoir below. The filtering element in the filter box prevents lobster excrement and other residue from falling into the reservoir and being carried to the pump. Removable overflow pipes extending above the normal water level of the upper compartment are mounted in the horizontal wall. These pipes are adjustable so as to help maintain the water in the upper compartment at a predetermined level. When the filter becomes clogged with feces excreted by the lobsters, or with other matter, the accumulating water in the upper compartment will overflow into the pipes and drop into the reservoir. The reservoir compartment is made large enough to hold all the water in both compartments, but when the pool is operating with water in the upper compartment, there is an air space between the level of the water in the reservoir and the bottom of the upper compartment so that water dropping through the filter box, or flowing down the overflow pipes, becomes aerated as it passes through the air space. Another function of the overflow pipes is to admit air into the air space in the reservoir compartment. The bottom of the reservoir has a sump or cavity from which dirty water may be pumped or drained through separate pipes leading from the sump. The water circulated in the pool contains synthetic salts to simulate sea water.

4. The upper compartment may be cleaned and the filtering element replaced by stopping the pump and by permitting the water to drain into the reservoir either through the filter box or through the openings exposed in the bottom of the upper compartment by the removal of the overflow pipes. Thus no brine water is lost when the compartment is cleaned or the filtering element replaced.

5. If the pump for any reason ceases to operate, the water in the upper compartment will drain through the filter into the reservoir and leave the lobsters exposed to the air, thus preventing their retention in stagnant water, that is, water without sufficient oxygen to sustain life in lobsters. Constant aeration of the water is required to replace the oxygen used up by the lobsters. Lobsters cannot live more than a few hours in stagnant water. They live a substantial number of hours longer out of water. This gives the user more time to discover the breakdown and to take appropriate steps to save the lobsters.

6. The plaintiff Brandano made his first pool in late 1958, less than a year before he filed his application for the patent. He sold his first pool in September 1958. About eight such pools had been sold by Brandano up to October 1960, when the defendants began to manufacture the alleged infringing pools.

7. The defendants made their first sale of a pool of their own manufacture on November 23, 1960. They call their pool the "Dayno pool." They manufactured and sold the pool after they had obtained possession of one of the plaintiffs' pools and while the Brandano patent application was pending in the Patent Office.

8. The Dayno pool manufactured and sold by the defendants is in all significant respects a copy of the pool illustrated and described in the Brandano patent and manufactured and sold by the plaintiffs.

9. The defendants deliberately copied the Brandano pool.

10. The defendants claim that the Dayno pool differs from the pool described in the Brandano patent in the following respects:

"(a) In the Dayno pool, water is pumped from the reservoir to the upper compartment through an outlet located below the normal water level in the display tank, rather than through a spray outlet located above the normal water level. Inducing water below the normal water level

avoids objectionable splashing and foaming on the surface.

"(b) In the Dayno pool, the tops of the drain pipes are continuously at or beneath the water level of the upper tank, so that excess water is carried off at a constant rate, and the drain pipes are not used primarily for the admission of air as explained in the Brandano patent.

"(c) In the Dayno pool, the rate of flow of the pump has no relation upon circulation or upon maintenance of air space in the lower compartment."

As to (a) above, I find no credible evidence that the spray outlet shown in the Brandano patent causes objectionable splashing and foaming on the surface. I find that placing the outlet below the normal water level is of no substantial consequence but is a deliberate attempt to avoid a literal infringement of the Brandano claim. The spray outlet above the normal water level contributes to aeration of the water. As to (b), I find that the tops of the drain pipes are not continuously at or beneath the water level of the upper tank. The defendants' claim in this respect is inconsistent with the following instructions (Exh. 8, p. 2) which they give to their customers on the maintenance of the Dayno pool:

"IMPORTANT

"If water becomes dirty or cloudy within two or three days after a solution change the filter has been packed too tightly and most of the water is passing through the overflow pipes and not through the filter. Since water passing through the overflow pipes is not filtered, dirty water is continually being circulated."

It is obvious that if the tops of the drain pipes are placed beneath the water level, the flow of unfiltered water into the reservoir would be greatly increased, a result which the defendants instruct their customers to avoid. As to (c), there is no credible evidence that in the Dayno pool the rate of flow of the pump has no relation upon circulation or upon maintenance of the air space in the lower compartment. The pump output in both the Brandano and Dayno pools is 10 to 15 gallons per minute.

11. Several kinds of inland lobster pools have been in operation since 1943, including the McGrath pool made under the McGrath patent, No. 2,594,474, issued April 29, 1952 (Exh. A). The McGrath patent illustrates and describes a "refrigerated display tank" for displaying "live aquatic creatures and maintaining such creatures alive and in a clean and healthy condition," comprising an open-top lobster pool for displaying lobsters and keeping them alive and healthy. The display tank has a bottom plate or wall, one section of which is perforated. A filter box having several different layers of filtering material is mounted under the perforated section of the tank bottom. The perforated section is removable to permit cleaning or replacement of the filtering material. Additional filtering apparatus is also located in a compartment of the tank below the display compartment. An overflow pipe is located at one end of the display compartment for draining excess water, and any material floating on the surface of the water, into the lower compartment. Pumps for circulating the filtered water to the display compartment are located in a separate bottom compartment. The outlets of the delivery pipes are placed below the level of the water in the display compartment. The McGrath patent does not state whether there is an air space above the water in the lower compartment, or whether the capacity of the lower compartment is large enough to hold the water in both the upper and lower compartments. No such air space is indicated in the drawings. Aeration of the water is accomplished by an air mixing device which injects air into the water flowing in the pipe supplying the display compartment.

McGrath pool requires at least half a day to clean and service the filters. When

the pool is cleaned the solution has to be drained out and is lost. If the pump stops operating while unattended, the lobsters would remain in the water, since the water in the display compartment could not flow through the filter into the lower compartment as is the case in the Brandano and Dayno pools.

12. A lobster pool openly in use at Captain Marden's Seafood, Inc., a seafood market in West Newton, Massachusetts, comprises an upper compartment for keeping and displaying live lobsters, and a lower compartment or reservoir which also holds all of the water in the upper compartment. When in normal operation with the upper compartment filled to the desired level, there is an air space between the level of the water in the reservoir compartment and the bottom wall of the upper compartment. This pool (hereafter referred to as the Marden pool) was bought in 1955 from the Atlantic Lobster Corporation. It does not appear that it was patented. The brine water was pumped from the reservoir and discharged onto the surface of the water in the display compartment. The Marden pool had filters in the supply line on the output side of the pump and none on the intake side. The unfiltered water interfered with the efficient operation of the pump. Since the pool was installed the display compartment has had two overflow pipes to carry off excess water. The tops of the overflow pipes have extended above the normal water level. Each pipe has a small hole near the bottom permitting the water to drain from the display compartment into the reservoir so that the lobsters do not remain in stagnant water in the event the pump stops functioning. The overflow pipes can be removed to permit the water in the display compartment to drain rapidly into the reservoir whenever the compartment has to be cleaned. This can be done without loss of the brine solution.

13. The Marden pool was in public use for several years prior to the filing of the Brandano patent application.

14. The removable filter referred to in claim 2 is disclosed in the McGrath patent.

15. A filter box with filter elements located in the bottom of the display compartment is also disclosed in the prior patent issued to McGrath. The specific filter box construction set forth in claim 3 of the Brandano patent would be an obvious mechanical expedient lacking invention.

16. The provision of a sump in the lower compartment as set forth in claim 4, and the provision of an adjustable overflow standpipe as set forth in claim 5 of the Brandano patent, were both obvious expedients and lack invention.

17. Every element claimed in the Brandano patent was known to prior art. The plaintiff Brandano has brought together these segments of prior art but has added nothing to the total stock of knowledge.

18. The combination of the elements described in claims 1 through 5 of the Brandano patent to produce the Brandano pool did not require the faculty of invention but merely mechanical skill.

19. The plaintiffs offered no evidence to prove that the plaintiff corporation has ever been a licensee under the Brandano patent.

## CONCLUSIONS OF LAW [2]

1. The claims in the Brandano patent, if valid, were infringed by the defendants. The Dayno pool manufactured and sold by the defendants is a thinly disguised copy of the pool illustrated and described in the Brandano patent. The

---

2. The following are the pertinent statutory provisions:

35 U.S.C. § 282: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

35 U.S.C. § 102: "A person shall be entitled to a patent unless—

\* \* \* \* \*

"(b) the invention was patented or described in a printed publication in this or a foreign country or in

defendants did not copy in literal detail. The differences, however, are minor, unimportant and insubstantial. They were introduced by defendants to conceal and shelter their piracy of the Brandano pool. The two pools are substantially the same. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S. Ct. 854, 94 L.Ed. 1097. The substitution of an outlet below the normal level of the water in the display compartment for a spray outlet added nothing of importance to the Dayno pool. On the contrary, it lessened the aeration of the water. Placing the tops of the overflow standpipes below the normal level of the water, even if it was done as claimed by the defendants, would not have avoided infringement. It would have increased the flow of unfiltered water into the reservoir. Impairment of function does not avoid infringement. Admiral Corp. v. Zenith Radio Corp., 1961, 10 Cir., 296 F.2d 708.

2. The claims in the Brandano patent are invalid for want of invention. "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. All the elements in claim 1 were known to prior art. They were either disclosed in the McGrath patent or found in the Marden pool. Claims 2 and 3 were likewise disclosed in the McGrath patent. Claims 4 and 5 show neither invention nor novelty. Overflow standpipes, whether adjustable, fixed, or removable, and sumps, have been known and used from time immemorial. The Brandano patent is not valid as a combination patent because it lacks invention.

The presence of invention is indispensable to the patentability of a mechanical device that brings old elements into cooperation. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra; McCord Corp. v. Beacon Auto Radiator Co., 1952, 1 Cir., 193 F.2d 985; Associated Folding Box Co. v. Levkoff, 1952, 1 Cir., 194 F.2d 252; Allied Wheel Products v. Rude, 1953, 6 Cir., 206 F.2d 752.

In Associated Folding Box Co., supra, 194 F.2d at page 257, the Court stated:

"The old elements which he combined each performed its own function in the combination, and their performance in concert was no more than the sum of their performances individually. Nor do we think that any extraordinary insight or unusual perspicacity was required to conceive of his combination of old elements, and certainly no remarkable talent was required to integrate the old elements in a single structure. His new and useful result was not a radically different tray, although it may have been, and probably was, a better one. We look, therefore, to see whether the improvement Levkoff wrought was an unusual or surprising consequence of the unification of the old elements he accomplished, and we are constrained to say that it was not. That is to say, scrutinizing the claim in the light of the severe test applicable now, we are forced to the view that while Levkoff made an improvement, his improvement did not amount to a sufficiently radical innovation to warrant a finding of invention."

Judgment will be entered dismissing the complaint without costs.

public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, * * *"

35 U.S.C. § 103: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"