**JEDDELOH BROTHERS SWEED MILLS, INC., a corporation, Otto Jeddeloh, Fred Jeddeloh, Appellants and Cross-Appellees,**

v.

**COE MANUFACTURING COMPANY, a corporation, Appellee and Cross-Appellant.**

**No. 20662.**

United States Court of Appeals Ninth Circuit.

March 3, 1967.

J. Pierre Kolisch, M. H. Hartwell, Jr., Jon M. Dickinson, of Kolisch & Hartwell, Portland, Or., for appellants and cross-appellees.

Kenneth S. Klarquist, of Buckhorn, Blore, Klarquist & Sparkman, Gunther F. Krause, of Krause, Lindsay & Nahstoll, Portland, Or., James T. Hoffmann, of Hoffmann & Yount, Cleveland, Ohio, for appellee and cross-appellant.

Before HAMLEY and KOELSCH, Circuit Judges, and WALSH, District Judge.

HAMLEY, Circuit Judge:

This suit involves the validity and infringement of claims 3, 5, 7 and 17 of Reissue No. 24,638 of Parker Patent No. 2,649,182, owned by plaintiff Coe Manufacturing Company (Coe). References hereinafter to the Parker patent pertain only to claims 3, 5, 7 and 17 of that patent. This is a combination patent describing an apparatus for feeding veneer into a multiple-deck conveyor-type veneer dryer.

The defendants are Jeddeloh Brothers Sweed Mills, Inc., manufacturer and seller of the accused apparatus, and Fred and Otto Jeddeloh, president and vice-president respectively, and major stockholders, of Jeddeloh Brothers. The defendants are collectively referred to herein as Jeddeloh.

The district court found and concluded that claims 3, 5, 7, and 17 of the Parker patent are valid and that claim 17 is infringed by Jeddeloh. A judgment was entered to this effect, awarding single damages and granting injunctive relief. Defendants appeal and plaintiff cross appeals. This is the second time that this cause has reached this court. See Coe Manufacturing Company v. Jeddeloh Brothers Sweed Mills, Inc. et al., 9 Cir., 306 F.2d 455.[1]

Jeddeloh contends, on its appeal, that: (1) the Parker patent is invalid for failure to meet the requirements of a patentable invention; (2) the Parker patent was invalidly reissued under the language of the reissue statute; (3) defendants did not infringe the Parker patent; (4) Coe is estopped to assert the patent claim which was held to be infringed; (5) the individual defendants are not personally liable for infringement damages; and (6) the amount of damages has been incorrectly determined.

1. In that decision we remanded the cause to the district court to make findings and conclusions regarding the question of the validity of the Parker patent and the question of infringement of various claims of that patent.

Coe argues, on its cross appeal, that: (1) in addition to the claim held to be infringed, other claims of the Parker patent were also infringed; (2) interest on the damages awarded to Coe was improperly computed; and (3) exemplary damages and attorneys' fees should have been awarded for Jeddeloh's wilful infringement of the Parker patent.

We hold that the Parker patent is invalid and therefore, without reaching the other issues raised on the appeal and cross appeal, reverse with directions to dismiss the action.

■■ As the Supreme Court recently stated in Graham, et al. v. John Deere Co. of Kansas City, et al., 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545, patentability is dependent upon three explicit conditions: novelty and utility as defined in 35 U.S.C. §§ 101, 102 (1964), and nonobviousness, as defined in 35 U.S.C. § 103 (1964). The district court, in its findings, held that the Parker reissue patent met all three of these tests.[2]

Jeddeloh questions the trial court's determination that the subject matter of the Parker reissue patent is novel and nonobvious, and advances additional reasons why the patent should be declared invalid.

We turn to the question of nonobviousness under the test of section 103.[3] Since the district court entered its judgment on May 21, 1965, the Supreme Court has announced two decisions dealing with the essential condition of nonobviousness. See Graham, et al. v. John Deere Co. of Kansas City, et al., 383 U.S. 1, 86 S.Ct. 684, and United States v. Adams, et al., 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, both announced on February 21, 1966. The general considerations which the Patent Office and courts should take into account in determining whether a claimed invention is nonobvious are discussed in Graham.

■ The entire tenor of the Graham decision is that there should be strict observance of all three explicit conditions precedent to the issuance of a patent, namely novelty, utility and nonobviousness, with special emphasis being placed on the latter.[4] The Court pointed out that Art. I, § 8, cl. 8 of the Constitution, from which the federal patent power is derived, is both a grant of power and a limitation. The limitation is that

2. While these determinations by the trial court were denominated by it as findings of fact, the determination of whether a claimed invention meets the test of nonobviousness is one of law where, as here, the relevant facts are not in dispute. See National Lead Company v. Western Lead Products Company, 9 Cir., 291 F.2d 447, 450–451. For a discussion of Ninth Circuit cases on this point, see 2 Walker on Patents (Deller's 1964 ed., at 103–104).

3. Section 103 reads as follows:
"§ 103. Conditions for patentability; non-obvious subject matter.
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

4. Among other things, the Court said:
"We believe that strict observance of the requirements laid down here will result in that uniformity and definiteness which Congress called for in the 1952 Act [in which the nonobviousness test of section 103 was enacted].
*       *       *       *       *
"In this connection we note that the Patent Office is confronted with a most difficult task. Almost 100,000 applications for patents are filed each year. Of these, about 50,000 are granted and the backlog now runs well over 200,000. 1965 Annual Report of the Commissioner of Patents 13–14. This is itself a compelling reason for the Commissioner to strictly adhere to the 1952 Act as interpreted here. * * *
"Although we conclude here that the inquiry which the Patent Office and the courts must make as to patentability must be beamed with greater intensity on the requirements of § 103, it bears repeating that we find no change in the general strictness with which the overall test is to be applied." (383 U.S. at 18–19, 86 S.Ct. at 694.)

the patent power shall be used only to promote advances in the "useful arts."

In *Graham,* the Court held that innovation, advancement, and things which add to the sum of useful knowledge are inherent requisites of a patent system subject to such a limitation. This is the standard expressed in the Constitution, said the Court, and it is the duty of the Commissioner of Patents and of the courts in the administration of the patent system to give effect to this constitutional standard by appropriate application, in each case, of the statutory scheme of Congress.

Reviewing the pertinent judicial and legislative history, the Supreme Court said, in *Graham,* that the test of nonobviousness, which first found statutory expression in section 103, was not intended to lower the level of patentability as previously determined. Instead, it was intended to codify existing judicial precedents and to promote uniformity and definiteness by focusing attention upon *nonobviousness* rather than the less definite "invention" language of Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683, and succeeding cases.

In *Graham,* the Supreme Court particularized the factual inquiries to be pursued in providing a basis for a legal conclusion as to whether the subject matter of the claimed invention was obvious or nonobvious within the meaning of section 103. The Court stated:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against

this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the *origin* of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." (383 U.S. at 17–18, 86 S.Ct. at 694.)

■■ The principles of patentability, as summarized above, are to be applied with special strictness in determining the patentability of combination patents. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151, 152, 71 S.Ct. 127, 95 L.Ed. 162, the Court said that the concept of invention is inherently elusive when applied to a combination of old elements. The Court pointed out that the conjunction of known elements must contribute something, and that only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.[5]

With these guiding principles in mind, we turn to the question of whether the Parker reissue patent, describing an apparatus for feeding green veneer into a multiple-deck veneer dryer, is invalid for nonobviousness. For the purpose of discussing that question we will assume, as the trial court held, that the Parker reissue patent is for a combination of old elements, that the combination shown is new as compared to other combinations disclosed by the prior art,[6] and that the Parker patent is primarily an apparatus for handling sheets of veneer.[7]

5. In *A. & P.* the Court also noted that it is more likely that a valid combination could be found in chemistry or electronics than in mechanics. The Court said:
   "Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics." (340 U.S. at 152, 71 S.Ct. at 130)

6. The most analogous prior combination patents are Streeter Patent No. 1,809,456,

describing an apparatus for feeding sheets of freshly-made and still moist wallboard into a multiple-deck dryer; Campbell Patent No. 1,216,773, describing an apparatus for handling sheets of metal; and Cross Patent No. 640,368, describing a machine for feeding sheets of paper into a printing press.

7. Jeddeloh does not agree that the Parker combination is new, or that it primarily claims an apparatus for handling veneer.

It is the practice in the Pacific Northwest plywood industry to cut or peel thin veneer from a log in long sheets. These are then cut into sheets or panels of irregular size and stacked in piles according to size, grade and thickness. Such veneer contains large amounts of moisture which must be removed prior to making the veneer into plywood. Removal of this moisture is accomplished by passing the veneer through long, heated dryers having four or more tiered conveyor decks upon which single thicknesses of the veneer are carried through the dryers.

Before the original Parker patent was applied for, stacks of veneer were positioned in front of a dryer. The veneer sheets were then pulled off the stacks by hand, one at a time, and lifted and pushed into the individual decks of the dryer. During the feeding of a dryer by hand, the sheets of veneer were sometimes broken or damaged and frequently the dryers were not kept completely full.

Green or undried veneer sheets are dissimilar to manufactured sheet products such as plasterboard, paper and sheet-metal, in that green veneer varies in quality, length, width, thickness, flexibility and flatness. Green veneer also has a tendency to curl. Because of these characteristics, green veneer is difficult to handle, particularly with a mechanical apparatus. Nevertheless, as early as 1936, Coe undertook to develop such an apparatus. Coe has been the leading manufacturer of equipment for plywood mills for many years, and has also manufactured dryers, conveyors and other sheet-handling equipment for the plasterboard and fibreboard industry.

From 1939 to 1941, Coe designed and constructed three different apparatuses for feeding veneer into a dryer. None of them performed satisfactorily, and all were scrapped after trial periods. In 1948, C. E. Parker, then a design engineer for Coe, but who died prior to the trial, developed the asserted invention described in the patent in suit. The Parker patent shows a preferred and an alternative embodiment.

The preferred embodiment of the patent is described in claims 3, 5 and 7,[8] and contains nine principal features: (1) a normally open pair of driven infeed pinch rolls between which the leading ends of the top layer of veneer to be fed into the dryer are pushed by the operator from a row of stacks positioned in front of the rolls; (2) the upper roll is movable up and down, so that a row or layer of veneer may be pushed between the rolls when the upper roll is raised; (3) a retractable stop is provided to align the leading ends of the veneer; (4) in timed relation to the operation of the dryer, periodically, the stop is raised and the upper roll is lowered so as to cause the veneer to be grasped between the two infeed pinch rolls, and thereby drawn from the stacks and propelled toward the dryer; (5) the infeed pinch rolls are movable vertically as a unit by suitable controls, so that, as veneer is removed from the stacks and the height of the stacks thereby lowered, the rolls may be lowered by the operator

8.  While there are variations between claims 3, 5 and 7, for our purposes the latter claim may be taken as representative of those claims.  Claim 7 reads:

"7.  In equipment for feeding material in sheet form into a multiple deck conveyor type machine, the combination of a feed end unit comprising a frame and a vertically movable assembly including a pair of pinch rolls, means for raising and lowering said assembly, means for driving said pinch rolls, means for producing relative movement of said pinch rolls toward and from each other, a conveyor type table connected at one end to said vertically movable assembly for movement therewith, a discharge end unit comprising a frame and a vertically movable assembly having the opposite end of said conveyor type table connected thereto for movement therewith, and means for moving said vertically movable assembly of said discharge end unit in timed relation to the relative movement of said pinch rolls toward and from each other, said last-named means comprising a control mechanism adapted to be operatively connected to the conveyor mechanism of said machine whereby said pinch rolls and said vertically movable assembly of said discharge end unit are moved in timed relation to the speed of the conveyor."

to maintain the nip of the rolls substantially in alignment with the top of the stacks; (6) the infeed rolls propel the veneer toward a set of driven outfeed rolls; (7) the outfeed rolls are automatically moved vertically as a unit stepwise past the tiered decks of the dryer so as to feed the veneer into the various decks of the dryer; (8) to support the veneer between the infeed and outfeed rolls, there is a conveyor-type table having moving belts encircling it and the lower outfeed pinch roll; and (9) the opening and closing of the infeed rolls and the indexing of the outfeed rolls past the dryer decks are all in timed relation to the speed of the dryer.

In summary, with the infeed rolls open, the operator pushes the top sheets on the stacks forward a small distance into ready position with their leading ends between the rolls. At the proper moment, the rolls automatically come together and propel the ready layer of veneer across the conveyor-type table to the outfeed rolls. In turn, the outfeed rolls propel the veneer into a deck of the dryer. At the proper time the outfeed rolls automatically move to the next deck to be loaded and the infeed rolls open to accept a new load.

The trial court held that claims 3, 5 and 7 were not infringed because the accused apparatus does not have a conveyor-type table or its equivalent.

The alternative embodiment of the asserted invention is described in claim 17, which is the only claim that was held to be infringed.[9] This embodiment contains five principal features: (1) an elevator is provided in front of the dryer; (2) an assembly is mounted upon this elevator, including a supporting frame and a pair of pinch rolls similar to the infeed rolls of the preferred embodiment; (3) these pinch rolls are periodically opened and closed in timed relation to the speed of the dryer. The stacks of veneer to be fed are positioned on the elevator in front of the roll assembly, and the top sheets are pushed by the operator between the open rolls; (4) the rolls are designed to be raised or lowered as a unit by the operator within the supporting framework so that they can be positioned in substantial alignment with the top of the stacks of veneer being fed; and (5) the elevator is automatically raised and lowered stepwise past the decks of the dryer so as to bring the rolls sequentially into alignment with the various dryer decks.

While the two embodiments of the asserted invention are designed to accomplish the same task, the alternative embodiment has only one set of pinch rolls and accordingly no conveyor-type table between sets of pinch rolls, as in the preferred embodiment.

In 1948, Coe constructed a veneer dryer feeder apparatus in accordance with the preferred embodiment of the patent in suit, and shipped it to Portland, Oregon, for trial. From 1948 to 1952, Coe attempted to secure permission from a number of plywood plants to install that feeding apparatus. Because of a general belief in the plywood industry that a mechanical veneer feeder could not successfully operate, Coe was unable to persuade any plant to try the feeder.

In 1952, Coe secured permission to install its feeder on a trial basis in a new plywood plant which had an extra veneer dryer not required for its normal plant operation. The feeder performed satisfactorily, was purchased by the plant, and was still in operation at the time of

9. Claim 17 reads:
"17. In equipment for loading material in sheet form into a multiple deck power driven conveyor type machine, the combination of vertically movable feed means having an entering end and a discharge end, said feed means including a pair of pinch rolls, means for driving said pinch rolls, power actuated means for vertically moving said entering end of said feed means, power actuated means for producing relative movement of said pinch rolls toward and from each other, and automatically controlled power actuated means for moving said discharge end of said feed means vertically in timed relation to the relative movement of said pinch rolls relative to each other."

the trial. Between 1952 and the commencement of the first trial on December 29, 1959, about 105 veneer feeders built under the Parker patent had been installed in plywood mills. A few of these were constructed under license from Coe, the balance were constructed by Coe.

The trial court found that Parker's asserted invention enables veneer to be fed into dryers with fewer men, with less damage to veneer, and with more uniform loading of the dryer, resulting in increased efficiency of the dryer. Mechanical feeders have virtually eliminated hand feeding of veneer dryers, and Coe's apparatus is a commercial success.

As indicated in the above-quoted excerpt from the *Graham* opinion, the differences between the prior art and the claims at issue, evidencing the novelty of the subject matter of the patent, must be appraised in order to resolve the question of obviousness. As stated above, for the purpose of reaching the question of obviousness, we have assumed that the Parker combination of old elements is novel as compared to combinations disclosed by the prior art.[10] But in dealing with the question of obviousness, it is important to note what is novel, and what is not novel, about the Parker combination.

None of the individual components of the Parker combination perform any different functions in the combination than they do out of it. The pinch rolls of the Parker patent do, in the combination, exactly what pinch rolls do out of the combination—they pull through sheet materials which are introduced between them. The means provided for driving those pinch rolls have the same effect on those rolls as they would have out of the combination. The power-actuated means for vertically moving the entering end of the feed means operate no differently in the combination than out of it. The same can be said of each of the other old elements which, in combination, comprise the Parker patent.

Nor do these old components in the total combination of Parker, or in any of the groupings of old components which go to make up that total combination, co-act to produce a new result as compared to the total combinations, and grouping of components, in the prior art. The Streeter, Campbell and Cross patents, as well as the Parker patent, describe a method of transferring sheet material from one place to another by automatic means. Streeter, as well as Parker, provides a way to vary vertical positioning of the outfeed end to accommodate variations in height at the destination. Cross and Campbell, as well as Parker, provide a way to vary vertical positioning of the infeed end to accommodate variations in height at the source. Streeter, as well as claims 3, 5 and 7 of Parker, provides a conveyor-type table between the infeed and outfeed ends of the apparatus. The use of pinch rolls is shown in Cross and Campbell as well as Parker. Given these similarities, it is not, in legal contemplation, a "new" result for Parker to handle moist veneer, as compared to moist fibreboard handled by Streeter, tin plate handled by Campbell, and paper handled by Cross.

The only sense in which the Parker combination is novel is that, in order to handle moist veneer mechanically, it was necessary to have a different range and positioning of old components than is to be found in such prior combinations as the Streeter, Campbell and Cross patents.[11] In our opinion, these elements of novelty, and the means of achieving them, would have been obvious to a person of ordinary skill in the art of handling sheet materials by mechanical means.

Such a person, we think, would have been able to devise variations of this

10. See text opposite note 6, above.

11. Incidental to these differences there had to be, as compared to the prior combinations, variations in the dimensions and settings of the old components, and differences in framework, gears, wiring and the like.

kind in accommodating old components to the handling of moist veneer. Experimentation was undoubtedly necessary to achieve an efficient veneer-handling apparatus. It was not necessary, however, to seek and apply any substantially new principle, as in the case of the combination described in the patent under review in United States v. Adams, et al., 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, to be discussed below. Nor, in our view, is there here present any other circumstance or consideration which dictates a conclusion that the subject matter of the claim in question was nonobvious at the time the purported invention was made.

Coe contends that *Adams*, supra, in which the combination patent there in issue was upheld, supports the view that the Parker combination is nonobvious. We do not agree. *Adams* involved a combination patent for a wet battery which provided a constant voltage and current without the use of acids. The Supreme Court held that this combination was nonobvious because, to conceive this combination required a person reasonably skilled in the art to disregard long-accepted principles in the science of electrochemistry. Parker did not have to ignore any long-standing principles in the art of handling sheet materials, or the art of making veneer which, to a person reasonably skilled in those arts, would have indicated a different result than he achieved.

■ We have not overlooked certain secondary considerations which provide indicia of nonobviousness where that issue is in doubt. The trial court found that the Parker apparatus fills a long-felt need in the plywood industry and is a commercial success. But commercial success without invention does not make patentability. A. & P. 340 U.S. at 153, 71 S.Ct. 127, 95 L.Ed. 162.[12] Likewise where the advance embodied in the patent is obvious, the fact that it solved a pre-patent problem is immaterial. See Alladin Plastics, Inc. v. Jerrold Stephan Co., 9 Cir., 362 F.2d 532, 534. The same can be said of evidence showing that the asserted invention was copied by others. Walker v. General Motors Corporation, 9 Cir., 362 F.2d 56, 60 and cases cited therein.

■ In reaching the conclusions expressed above we have endeavored to apply, with the required strictness, the principles announced by the Supreme Court in the *Graham* decision referred to above. Taking into account the scope and content of the prior art of mechanically moving sheet materials, the differences between that prior art and the apparatus described in the Parker claims in issue, and the level of ordinary skill in that art, all as revealed or implicit in the undisputed facts summarized above, we hold that the subject matter of claims 3, 5, 7 and 17 of the Parker patent is plainly obvious within the meaning of section 103, and that those claims are therefore invalid.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

12. This is not the only case in which this court, under the particular circumstances, has given only limited weight to the factor of commercial success. We stated in Farr Company v. American Air Filter Company, Inc., 9 Cir., 318 F.2d 500, 504, that such factors as commercial success "are 'at the most weak reeds for a patentee to lean upon.' McCord Corp. v. Beacon Auto Radiator Co., 193 F.2d 985, 989 (1st Cir., 1952). They may tip the scales in favor of invention where the question is close and the court in doubt, but where invention is clearly lacking they do not make for patentability."